# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**OMER NINHAM,**
            **Petitioner,**

        **v.**                                     **Case No. 22-C-0617**

**MICHAEL MEISNER, Warden,**
**Fox Lake Correctional Institution,**
            **Respondent.**

## DECISION AND ORDER

Omer Ninham petitions for a writ of habeas corpus under 28 U.S.C. § 2254. He contends that his sentence of life without the possibility of parole, which he received for a homicide committed at the age of 14, violates the Cruel and Unusual Punishments Clause of the Eighth Amendment.

## I. BACKGROUND

The Wisconsin Supreme Court described the facts of Ninham's crime as follows:

> On September 24, 1998, around dusk, 13-year-old [Zong] Vang was bicycling home along Webster Avenue in Green Bay, Wisconsin. Vang's older brother had sent Vang to the grocery store for tomatoes. Vang was returning home on his bicycle, carrying a plastic grocery bag filled with tomatoes, when he was approached by five juveniles: 14-year-old Ninham, 13-year-old Richard Crapeau (Crapeau), 13-year-old Jeffrey P., 14-year-old Amanda G., and 14-year-old Christin J.
>
> Ninham and the other four juveniles did not know or recognize Vang. Moreover, by all accounts, Vang never said or did anything to provoke the five juveniles. Rather, at the time, Crapeau was upset with his mother and "wanted to fight or see a fight." Consequently, Crapeau said to Ninham, "Let's mess with this kid," and Ninham responded, "'I got your back,' meaning he would back [Crapeau] up in a fight."
>
> Ninham and Crapeau began by verbally taunting Vang, while the other three juveniles "egg[ed]" them on. Ninham and Crapeau's assaults escalated into physical attacks. Crapeau bumped into Vang's shoulder and yanked his bicycle away from him. Crapeau also grabbed Vang's grocery

bag out of his hands and threw it in the direction of St. Vincent's Hospital, located along the same street. When Vang asked for his bicycle back, Ninham punched Vang, knocking him down.

Vang got up and started running towards the nearby St. Vincent's Hospital parking ramp. All five juveniles chased after Vang, eventually catching up to him on the top, or fifth floor, of the parking ramp. When they caught up to him, Crapeau punched Vang in the face. Vang repeatedly asked why they were trying to hurt him and pleaded with them to leave him alone. Instead, Ninham and Crapeau began pushing Vang back and forth between them, in a game Jeffrey P. referred to as "chicken." Ninham punched Vang in the chest as he pushed him back and forth.

Ninham then pinned Vang by his wrists against the parking ramp's concrete wall. While Vang squirmed to get out of Ninham's grasp, Crapeau again punched Vang in the face. According to Crapeau, Vang was crying and screaming, "'Let me go.'"

With Ninham still holding Vang by his wrists, Crapeau grabbed Vang's ankles. Ninham and Crapeau then began swinging Vang back and forth out over the parking ramp's concrete wall—a drop that measured nearly 45 feet to the ground. Vang was crying and screaming, begging Ninham and Crapeau not to drop him. While swinging Vang out over the wall, Crapeau let go of Vang's feet and told Ninham to "[d]rop him." Ninham let go of Vang's wrists, and in Crapeau's words, Vang "just sailed out over the wall."

At the same time, approximately 8:00 p.m., bystander Steven Heraly was in his vehicle exiting the St. Vincent's Hospital parking ramp when he heard what sounded like a "bag of wet cement hitting the pavement."

Vang landed on his back on the parking ramp's paved exit lane, 12 feet from the base of the ramp.

Rescue personnel, dispatched at 8:03 p.m., detected a faint pulse from Vang. Vang was transported to St. Vincent's Hospital where physicians were unable to revive him.

An autopsy revealed that Vang suffered a blunt impact to his head and trunk and died from craniocerebral trauma due to a fall from height.

Ninham and the other four juveniles never checked on Vang's condition and instead ran from the scene. Still, the Green Bay Police Department was able to focus its investigation on the five juveniles after some of them, in particular, Jeffrey P. and Amanda G., indicated to relatives and police that they knew who was responsible for Vang's death.

In his statement to police, Jeffrey P. described how Ninham stood for several seconds looking over the edge of the wall at Vang below. Ninham then looked at Jeffrey P. and said, "Don't say nothing. Better not say shit."

*State v. Ninham*, 333 Wis. 2d 335, 346–48 (2011).

The investigation into Vang's murder lasted several months. Ninham was arrested for the crime on June 11, 1999 (ECF No. 9-1 at 14 of 21) and charged with first-degree intentional homicide in violation of Wis. Stat. § 940.01(1) (1997–98) and physical abuse of a child in violation of Wis. Stat. § 948.03(2)(b) (1997–98), both as a party to a crime under Wis. Stat. § 939.05 (1997–98). For several months prior to his arrest, Ninham resided in a group home, where he received treatment for substance abuse and suicidal thoughts. (ECF No. 9-1 at 17 of 21.)

After his arrest, Ninham made threats against the judge presiding over the pretrial phase of the case and against the other juveniles who had witnessed the murder. This conduct resulted in additional charges. As described by the Wisconsin Supreme Court:

> On October 13, 1999, prior to trial on the aforementioned charges, the State charged Ninham with one count of threat to a judge in violation of Wis. Stat. § 940.203(2) (1999–00) and three counts of intimidation of a witness in violation of Wis. Stat. § 940.43(3) (1999–00). The complaint alleged that while Ninham was detained in Brown County's juvenile detention facility, he threatened the life of Judge Richard J. Dietz, the circuit court judge then presiding over Ninham's case. The complaint further alleged that upon learning of the other juveniles' statements to police, Ninham threatened to conduct a "drive by" of Jeffrey P.'s house, to "rape and kill" Amanda G., and to arrange for the killing of Crapeau's sister.

*Ninham*, 333 Wis. 2d at 349.

The initial charges of homicide and physical abuse of a child proceeded to a jury trial. Ninham was found guilty of both offenses. Later, the state moved to dismiss the charges involving the threat to a judge and witness intimidation and asked that they be read in.

3

Ninham's conviction of first-degree intentional homicide carried a mandatory life sentence but gave the trial court discretion regarding eligibility for parole. The trial court had three options: (1) it could make Ninham eligible for parole after 20 years of prison; (2) it could set parole eligibility for any date beyond that; or (3) it could determine that Ninham was not eligible for parole. Wis. Stat. § 973.014(1) (1997–98). Prior to the sentencing hearing, the trial court received a presentence investigation ("PSI") that the Wisconsin Supreme Court described as follows:

> [The PSI] revealed that Ninham, by then 16 years old, continued to deny any involvement in Vang's homicide. Furthermore, the PSI explained that "[b]y all accounts, [ ] Ninham emanates from an extremely dysfunctional family structure," in which both of his parents and several of his siblings engage in severe substance abuse and domestic violence. The PSI described Ninham as a "serious substance abuser" who snorted cocaine on a weekly basis and, since grade school, drank alcohol every day, often alone, and usually to the point of unconsciousness. The PSI also revealed that Ninham, a member of the Menominee Indian Tribe, claimed to have a newfound interest in Native American spirituality.

*Ninham*, 333 Wis. 2d at 351.

The defense presented the court with its own report from a sentencing consultant, Vicky Padway. (ECF No. 9-1 at 12–21.) The defense report emphasized Ninham's age, his family issues, and his issues with alcohol and drug use. It described Ninham's time residing at the group home and stated that he had made "progress." (*Id.* at 17.) The report stated that his depression was under control, that he was dealing with his alcohol and emotional issues, and that he was honest. (*Id.*) It noted that Ninham had attempted suicide by hanging while he was in pretrial detention and that he had scarring around his neck as a result. (*Id.* at 18.) The report noted that, during his interview, Ninham stated that he would kill anyone who "touches him in prison." (*Id.* at 19.) The sentencing

consultant opined that "these are not the words of a ruthless young man, but of a frightened child." (*Id.*) The report continued:

> He is young and immature. He has not had the benefit of a nurturing environment. In fact, when he was living within the structured setting of [the group home], he thrived. He felt safe. Omer has never felt safe. He has always been subjected to the unpredictable behavior of violent alcoholics.

(*Id.*)

At the sentencing hearing, the court heard from Vang's family members and Ninham himself. Ninham told the circuit court that he was sorry about Vang's death, but "[t]here wasn't nothing I could do. I wasn't there. I'm going to keep saying that until the day I die. I was not there, and that's the honest truth." (Sentencing Tr. at 22, ECF No. 8-13.)

Ninham's attorney presented arguments at sentencing that focused on his youth and the difficulties he had faced in life. (Sentencing Tr. at 17–21.) Among other things, defense counsel stressed that Ninham was 14 at the time of the crime and came from a "dysfunctional family" that had "problems with alcohol," "problems with abuse against each other," and problems with abuse against their children. (*Id.* at 18.) Defense counsel noted that Ninham was "left to his own devices with no real emotional support," and that he was "really a street kid." (*Id.*) Counsel asked the court "to take a look at the circumstances, the age, the emotional maturity of this young man." (*Id.* at 19.) Counsel also stressed that Ninham's juvenile record involved no acts of violence, in that his prior offenses were property crimes. (*Id.*) Regarding the read-in offenses of threat to a judge and witness intimidation, counsel argued that "a young man put in this situation may do a number of things. He may get depressed. He may try to commit suicide. He may lash out in order to protect himself and to think that that's some way to be mature and to prove

5

to other people within the system that he's somewhat tough and he's not to be fooled with." (*Id.* at 20–21.)

The Wisconsin Supreme Court summarized the trial court's comments at sentencing as follows:

> In imposing Ninham's sentence, the circuit court considered three primary factors: the gravity of the offense, the character of the offender, and the need to protect the public. First, the circuit court regarded the gravity of the offense as "beyond description" and indisputably "horrific." The circuit court noted that the offense has had an indescribable impact on Vang's family and friends and on the Green Bay community. Second, concerning the character of the offender, the circuit court "concede[d] for the sake of discussion that Omer Ninham is a child" but nevertheless described Ninham as "a frightening young man." The circuit court acknowledged that Ninham derives from a dysfunctional family but refused to let that excuse Ninham's conduct, explaining that Ninham is "a child of the street who knew what he was doing . . . ." Third, the circuit court reasoned that the community needs to be protected from Ninham: "Society needs to know, and especially this community needs to know, that you can send your child to the grocery store and expect to see him again."
>
> In addition, the circuit court expressed amazement at the fact that Ninham continued to deny even being there on the evening of Vang's death. The circuit court recognized that alcohol was nearly a daily part of Ninham's existence but declined to view that as an excuse for his behavior, finding that Ninham chose not to take advantage of the opportunities he had to turn away from negative influences.

*Ninham*, 333 Wis. 2d at 352–53.

On the count of first-degree intentional homicide, the circuit court sentenced Ninham to life imprisonment without the possibility of parole. For the count of physical abuse of a child, the circuit court sentenced Ninham to five years' imprisonment, consecutive to the life sentence. *Ninham*, 333 Wis. 2d at 352.

Ninham pursued a direct appeal in 2000 that raised claims involving the trial court's *sua sponte* dismissal of two potential jurors with felony convictions. The Wisconsin Court of Appeals rejected those claims and affirmed his conviction in 2001.

6

On March 1, 2005, the Supreme Court of the United States decided *Roper v. Simmons*, which holds that the Eighth Amendment forbids imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed. 543 U.S. 551, 578 (2005). Based on the reasoning of *Roper*, in 2007, Ninham filed a motion for postconviction relief in state court under Wis. Stat. § 974.06. The 2007 postconviction motion eventually made its way to the Wisconsin Supreme Court, and that court's opinion in that proceeding, which was published in 2011, is the source of the excerpts I have reproduced above.

Before the state supreme court, Ninham argued that imposition of a sentence of life without parole on a person who was under 18 at the time of the offense violated the Eighth and Fourteenth Amendments of the United States Constitution and the Wisconsin Constitution. *Ninham*, 333 Wis. 2d at 357–81. In the alternative, Ninham raised an as-applied claim based on the Eighth Amendment and the Wisconsin constitution in which he argued that his particular sentence was disproportionately severe. *Id.* at 381–82. He also raised a claim based on then-recent MRI studies indicating that the brain is not fully developed early in childhood and that making impulsive decisions and engaging in risky behavior is an inevitable part of adolescence. *Id.* at 382–83.[1]

The Wisconsin Supreme Court rejected all of Ninham's claims on the merits. Particularly relevant here is the court's rejection of Ninham's Eighth Amendment as-applied claim in which he argued that his sentence was disproportionate. The court first

---

[1] Ninham also argued that the trial court improperly sentenced him based on a religious belief expressed by the victim's family during the sentencing hearing. *Ninham*, 333 Wis. 2d at 387–89. That claim is not relevant to the present proceedings.

observed that "[t]he standard for determining whether a punishment is cruel and unusual in a particular case is the same under both federal and Wisconsin law." *Ninham*, 333 Wis. 2d at 381. The court wrote that a sentence is cruel and unusual "only if the sentence is so excessive and unusual, and so disproportionate to the offense committed, as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances." *Id.* at 382 (internal quotation marks omitted). The court then applied this standard to Ninham:

> Under these circumstances, we simply cannot say that Ninham's sentence of life imprisonment without parole is so disproportionate to the crime he committed "'as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper.'" There is no question that Ninham's punishment is severe, but it is not disproportionately so. The manner in which Ninham took Vang's life was horrific and senseless. The severity of the homicide was only compounded by the fact that Ninham refused to take any responsibility and in fact threatened the lives of the other juveniles who did. That Ninham was just 14 years old at the time of the offense and suffered an indisputably difficult childhood does not, as he contends, automatically remove his punishment out of the realm of proportionate.

*Id.* (citation omitted).

While Ninham's postconviction motion was pending before the Wisconsin Supreme Court, the Supreme Court of the United States decided *Graham v. Florida*, in which it held that the Eighth Amendment prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. 560 U.S. 48, 82 (2010). The Wisconsin Supreme Court applied *Graham* in its opinion rejecting Ninham's Eighth Amendment claims. *See Ninham*, 333 Wis. 2d at 357. However, after the Wisconsin Supreme Court decided those claims, the Supreme Court of the United States decided *Miller v. Alabama*, in which it held that mandatory life imprisonment without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's

8

prohibition on cruel and unusual punishments. 567 U.S. 460, 489 (2012). A few years later, the Supreme Court decided *Montgomery v. Louisiana*, which holds that *Miller* announced a new substantive constitutional rule that applies retroactively on collateral review. 577 U.S. 190, 206–13 (2016).

Based on *Miller* and *Montgomery*, Ninham commenced a second collateral attack in the Wisconsin courts in 2016 by filing another postconviction motion under Wis. Stat. § 974.06. The trial court denied the motion, and Ninham appealed. In his opening brief in the Wisconsin Court of Appeals, Ninham developed three arguments: (1) *Miller*'s holding applies to discretionary life-without-parole sentences in addition to mandatory sentences; (2) Ninham's sentence violates *Miller* and *Montgomery* because the sentencing court did not "take into account" Ninham's "youth and its attendant characteristics" or find that Ninham was "irreparably corrupt" before imposing a sentence of life without parole (ECF No. 8-2 at 27 of 58); and (3) the postconviction court erred when it determined, without holding a new sentencing hearing, that the original sentence accounted for the mitigating factors of youth outlined in *Miller* and *Montgomery*. In its response brief, the state argued that *Miller*'s holding does not apply to discretionary life-without-parole sentences. Alternatively, it argued that even though Ninham's sentencing hearing occurred before *Miller* was decided, the sentencing court addressed the types of age-related considerations discussed in *Miller*, and therefore resentencing was not required. Ninham responded to the state's arguments in his reply brief.

After receiving the parties' briefs, the Wisconsin Court of Appeals certified the appeal to the Wisconsin Supreme Court. However, the supreme court did not accept the certification. The court of appeals then decided to hold the case in abeyance pending the

9

Wisconsin Supreme Court's decision on a petition for review filed in another state case. Around this time, the Supreme Court of the United States granted certiorari in another life-without-parole case involving a juvenile offender. The Wisconsin Supreme Court held its decision on the petition for review in abeyance pending the decision in the latest U.S. Supreme Court case. (ECF No. 8-5 at 3.)

In 2021, the Supreme Court decided the case at issue, *Jones v. Mississippi*, __ U.S. __, 141 S. Ct. 1307 (2021). In that case, the Court held that a sentencer is not required to make a factual finding of permanent incorrigibility before imposing a discretionary sentence of life without parole on a juvenile homicide offender. *Id.* at 1318–19. The Court also held that a sentencer is not required to provide an on-the-record sentencing explanation that makes an implicit finding of the offender's permanent incorrigibility. *Id.* at 1319. In its opinion, the Court noted that it was not considering "any as-applied Eighth Amendment claim of disproportionality regarding Jones's sentence." *Id.* at 1322.

After *Jones* was decided, the Wisconsin Court of Appeals issued its decision on Ninham's latest appeal. The court described Ninham's arguments as follows:

> On appeal, Ninham contends that Miller applies to discretionary life-without-parole sentences, such as his own. He also argues that the sentencing court did not comply with the standards set forth in *Miller* and *Montgomery v. Louisiana*, 577 U.S. 190 (2016), because the court did not consider his youth and its attendant circumstances as mitigating factors, nor did it consider whether he was permanently incorrigible.

(ECF No. 8-5 at 3.) The court concluded that *Jones* interpreted or applied *Miller* in a way that required rejection of Ninham's claims. The court reasoned as follows:

> The *Jones* Court held that "a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient" under the Eighth Amendment for a case involving a juvenile offender who committed a

10

homicide offense. *Jones*, 141 S. Ct. at 1313. "*Miller* . . . mandated 'only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing' a life-without-parole sentence." *Jones*, 141 S. Ct. at 1316 (citation omitted). The Court further explained that

> *Miller* followed the Court's many death penalty cases and required that a sentencer consider youth as a mitigating factor when deciding whether to impose a life-without-parole sentence. *Miller* did not require the sentencer to make a separate finding of permanent incorrigibility before imposing such a sentence. And *Montgomery* did not purport to add to *Miller*'s requirements.

*Jones*, 141 S. Ct. at 1316. The Court concluded that a sentencing court does not need to provide an on-the-record sentencing explanation with an explicit or implicit factual finding of permanent incorrigibility. *See id.* at 1318-21.

> Here, the sentencing court considered Ninham's youth and its attendant circumstances as mitigating factors when it sentenced him to life without parole. Ninham's attorney repeatedly asked the court to consider Ninham's age and his emotional immaturity. The sentencing court, in turn, explicitly discussed Ninham's youth in its sentencing remarks, stating: "I'll concede for the sake of discussion that Omer Ninham is a child, but he's a child beyond description to this Court . . . . I recognize his age. He's a young man . . . . I recognize his emotional stability or lack thereof." The court also acknowledged Ninham's difficult upbringing, noting that "I can't condone at all the circumstances that Omer Ninham found himself in, but I certainly cannot allow that to become an excuse for the horrific conduct that took place . . . ." Ultimately, the court gave more weight to other factors, including the "horrific" nature of the offense and the need to protect the public, than Ninham's age and its attendant circumstances. It concluded that life without parole eligibility was the appropriate sentence. Ninham's sentence was therefore not contrary to *Miller* or *Montgomery*.

(ECF No. 8-5 at 3–4.) The court also determined that, because the original sentence complied with the requirements of *Miller*, *Montgomery*, and *Jones*, the court did not need to consider Ninham's alternative argument that the circuit court erred by deeming the original sentence appropriate without holding a new sentencing hearing. (*Id.* at 5.)

Ninham filed a petition for review with the Wisconsin Supreme Court. Ninham's arguments in the petition largely tracked the arguments he made in the Wisconsin Court

11

of Appeals. However, Ninham also argued for the first time that his sentence is "unconstitutionally disproportionate as applied to him." (ECF No. 8-6 at 18 of 42.) This argument was based on the passage in *Jones* in which the Supreme Court mentioned the possibility of a juvenile offender's bringing an "as-applied Eighth Amendment claim of disproportionality" with respect to a discretionary sentence of life without parole. 141 S. Ct. at 1322. Here, Ninham argued that the record established that his crime reflected "unfortunate yet transient immaturity" rather than "irreparable corruption," and that therefore his sentence of life without parole is unconstitutionally disproportionate. (ECF No. 8-6 at 19 of 42.)

The Wisconsin Supreme Court denied Ninham's petition for review. He then commenced the present case by petitioning for a writ of habeas corpus under 28 U.S.C. § 2254. The petition raises two claims or grounds for relief: (1) Ninham's life-without-parole sentence is "unconstitutionally disproportionate as applied to him in violation of clearly established United States Supreme Court precedent" (ECF No. 1 at 8); and (2) the original sentencing court's failure to consider Ninham's age as "mitigating" was "contrary to clearly established United States Supreme Court precedent" (*id.* at 18). In his answer to the petition, the respondent admits that "Ninham raised the two *Miller* claims raised in his section 2254 petition through one full round of state court review." (ECF No. 8, ¶ 9.) However, respondent also alleges the following in his answer: "Unless specifically admitted elsewhere, Respondent asserts that Ninham procedurally defaulted at least some of his federal claims." (*Id.* ¶ 14.)

The parties have filed briefs on the merits of Ninham's claims. Respondent does not raise a defense based on lack of exhaustion or procedural default in his brief.

12

## II. DISCUSSION

Ninham raises two grounds for habeas relief: (1) an as-applied Eighth Amendment claim arguing that his sentence is disproportionate, and (2) an as-applied Eighth Amendment claim arguing that the sentencing court failed to consider his age as a mitigating factor. Respondent contends that, to the extent these claims raise questions of federal law,[2] they are subject to the deferential standard of review in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under this standard, a federal court may not grant habeas relief with respect to any claim that was "adjudicated on the merits in State court proceedings" unless the petitioner shows that the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States or was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. 28 U.S.C. § 2254(d). If the state court did not adjudicate the claim on the merits, the federal court reviews the claim de novo. *Cone v. Bell*, 556 U.S. 449, 472 (2009).

Ninham contends that the Wisconsin Court of Appeals did not adjudicate his as-applied disproportionality claim on the merits, and that therefore I may review that claim de novo. However, both parties agree that § 2254(d) applies to Ninham's claim that the sentencing court did not properly consider his age as a mitigating factor. I will therefore

---

[2] Respondent contends that, despite his reliance on the Eighth Amendment and Supreme Court precedent, Ninham is actually raising a state-law claim challenging the trial court's exercise of its sentencing discretion. (Br. in Opp. at 6–10.) However, I do not understand Ninham to be raising any challenge to the sentencing court's exercise of its discretion except insofar as the exercise of that discretion may have transgressed federal constitutional limits.

begin by discussing the latter claim. I will then consider the disproportionality claim. But first, I provide a general discussion of the Supreme Court's recent cases on the constitutionality of sentencing juveniles to life in prison without the possibility of parole.

## A.    *Miller*, *Montgomery*, and *Jones*

Petitioner's claims arise under a series of cases decided by the Supreme Court over the past ten years. In the first case, *Miller v. Alabama*, the Supreme Court held that the Eighth Amendment prohibits mandatory sentences of life without parole for juvenile offenders. 567 U.S. at 489. The reasoning of *Miller* depended, in part, on earlier cases in which the Court held that the Eighth Amendment barred sentencing juvenile offenders to death, *Roper v. Simmons*, 543 U.S. 551 (2005), and to life without parole for nonhomicide offenses, *Graham v. Florida*, 560 U.S. 48 (2010). In *Miller*, the Court recognized that *Roper* and *Graham* established that "children are constitutionally different from adults for purposes of sentencing." 567 U.S. at 471. In all three cases, the Court relied on three findings to support this conclusion:

> First, children have a "'lack of maturity and an underdeveloped sense of responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking. *Roper,* 543 U.S., at 569. Second, children "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. *Ibid.* And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]." *Id.,* at 570.

*Miller*, 567 U.S. at 471. *Miller* reasoned that because children are different from adults for purposes of sentencing, a sentencer must have the opportunity to "tak[e] account of an offender's age and the wealth of characteristics and circumstances attendant to it" before imposing a sentence of life without parole. *Id.* at 476. Because mandatory life-without-

14

parole sentencing deprives sentencers of this opportunity, it violates the Eighth Amendment. *Id.* at 479–80. Importantly, however, the *Miller* Court did not categorically bar life without parole for juvenile killers. *Id.* at 479. But the Court thought that, under discretionary sentencing, "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id.*

A few years later, the Supreme Court decided *Montgomery v. Alabama*, in which it held that the rule of *Miller* applied retroactively to cases on collateral review. *Montgomery* described *Miller* as requiring a sentencing judge to consider, before sentencing a juvenile to life without parole, "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." 577 U.S. at 208 (quoting *Miller*, 567 U.S. at 480). *Montgomery* also stated that, although *Miller* did not bar life without parole for juveniles, it deemed that penalty unconstitutional "for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Id.* at 209. The Court reasoned that, because *Miller* imposed this constitutional limit on sentencing, it recognized a new substantive rule of criminal law that, under *Teague v. Lane*, 489 U.S. 288 (1989), applies retroactively to cases on collateral review. However, the Court in *Montgomery* noted that *Miller* "did not require trial courts to make a finding of fact regarding a child's incorrigibility." 577 U.S. at 211. Still, the Court emphasized that although formal factfinding was not required, states were not "free to sentence a child whose crime reflects transient immaturity to life without parole." *Id.* "To the contrary," the Court reasoned, "*Miller* established that this punishment is disproportionate under the Eighth Amendment." *Id.*

15

The final Supreme Court case at issue is *Jones v. Mississippi*. That case addressed whether, before sentencing a juvenile to life without parole, a trial court must explicitly find that an offender is permanently incorrigible or make statements on the record implicitly finding that the offender is permanently incorrigible. 141 S. Ct. at 1311. The Court held that a factual finding of permanent incorrigibility is not required, *id.* at 1318–19, and that an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility is also not required, *id.* at 1321. The Court interpreted *Miller* as holding that "the Cruel and Unusual Punishments Clause of the Eighth Amendment prohibits *mandatory* life-without-parole sentences for murderers under 18" but allows "*discretionary* life-without-parole sentences for those offenders." *Id.* at 1312. The *Jones* Court wrote that, under *Miller* and *Montgomery*, "a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Id. Jones* understood *Miller* as requiring that a sentencer "consider youth as a mitigating factor when deciding whether to impose a life-without-parole sentence" but not requiring the sentencer "to make a separate finding of permanent incorrigibility before imposing such a sentence." *Id.* at 1316. *Jones* also stated that "*Montgomery* did not purport to add to *Miller*'s requirements," *id.*, and it noted that *Montgomery* explicitly stated that "a finding of fact regarding a child's incorrigibility . . . is not required," *id.* at 1317 (quoting *Montgomery*).

In the course of rejecting the claim that a sentencer must "at least provide an on-the-record sentencing explanation with an 'implicit finding' of permanent incorrigibility," the *Jones* Court discussed what it means for a sentencer to "actually consider[]" a defendant's youth under *Miller*. 141 S. Ct. at 1319. Here, the Court rejected the idea that

16

"meaningful daylight" existed "between (i) a sentencer's discretion to consider youth, and (ii) the sentencer's actual consideration of youth." *Id.* According to the Court, "if the sentencer has discretion to consider the defendant's youth, the sentencer necessarily *will* consider the defendant's youth, especially if defense counsel advances an argument based on the defendant's youth." *Id.* The Court continued: "Faced with a convicted murderer who was under 18 at the time of the offense and with defense arguments focused on the defendant's youth, it would be all but impossible for a sentencer to avoid considering that mitigating factor." *Id.* The Court described its key point as being that "in a case involving a murderer under 18, a sentencer cannot avoid considering the defendant's youth if the sentencer has the discretion to consider that mitigating factor." *Id.* at 1319–20. Thus, a sentencer is not required to prove that it actually considered youth as a mitigating factor by giving a sentencing explanation from which a finding of permanent incorrigibility can be inferred. *Id.*

In a footnote, the *Jones* Court allowed that, if the sentencer "expressly refuses *as a matter of law*" to consider the defendant's youth, then the defendant "might be able to raise an Eighth Amendment claim under the Court's precedents." *Id.* at 1320 n.7. Here, the Court distinguished a sentencer's refusing as a matter of law to consider youth from the sentencer's "deeming the defendant's youth to be outweighed by other factors" and "deeming the defendant's youth to be an insufficient reason to support a lesser sentence under the facts of the case." *Id.* The Court regarded the latter two exercises of discretion as permissible under its precedents. *See id.*

In concluding, the Court found that the resentencing of Jones complied with *Miller* and *Montgomery* "because the sentence was not mandatory and the trial judge had

discretion to impose a lesser punishment in light of Jones's youth." *Id.* at 1322. But the Court also wrote that the case "[did] not properly present . . . any as-applied Eighth Amendment claim of disproportionality regarding Jones's sentence." *Id.* The Court stated that, therefore, it was not considering any such claim. *Id.*

Although *Jones* appears to have walked back some of the constitutional protections granted juveniles by *Miller* and *Montgomery*, the Court claimed to be "carefully follow[ing]" both cases and expressly stated that it was not overruling either. *Jones*, 141 S. Ct. at 1321. Still, the Court suggested that it was limiting those cases to their holdings:

> Today's decision does not overrule *Miller* or *Montgomery*. *Miller* held that a State may not impose a mandatory life-without-parole sentence on a murderer under 18. Today's decision does not disturb that holding. *Montgomery* later held that *Miller* applies retroactively on collateral review. Today's decision likewise does not disturb that holding.

*Id.*

The dissenting Justices believed that the Court's decision "guts" *Miller* and *Montgomery*. 141 S. Ct. at 1328 (Sotomayor, J., dissenting). In the dissent's view, the Court's holding implies that "[e]ven if the juvenile's crime reflects 'unfortunate yet transient immaturity,' he can be sentenced to die in prison." *Id.* (quoting *Miller*, 567 U.S. at 479). The dissent also understood the Court's opinion as holding that "[i]t does not matter whether the sentencer meaningfully considers youth." *Id.* at 1330. Rather, "a discretionary sentencing procedure suffices." *Id.* (quoting the majority opinion).

## B. Failure to Consider Age as a Mitigating Factor

Ninham claims that his life-without parole sentence violates *Miller* and *Montgomery* because, although the trial court had discretion to impose a lesser sentence, the court did not consider his age as a mitigating factor. As indicated above, the Wisconsin Court of

18

Appeals adjudicated this claim on the merits, and therefore the standard of review in 28 U.S.C. § 2254(d) applies. Accordingly, I may grant relief only if the court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States or involved an unreasonable determination of the facts in light of the evidence presented in state court.

I believe that my discussion of *Miller*, *Montgomery*, and *Jones*, above, shows that Ninham cannot satisfy § 2254(d) on this claim. It is reasonable to interpret *Jones* as holding that, under *Miller* and *Montgomery*, a juvenile's sentence of life without parole is consistent with the Eighth Amendment so long as the sentencer had discretion to impose a lesser sentence and did not refuse to consider youth as a matter of law. Indeed, that is how the dissenting Justices in *Jones* interpreted the Court's opinion. Under a reasonable interpretation of *Jones*, then, a sentencer does not have to make an explicit finding of permanent incorrigibility or even discuss youth as a mitigating factor in a sentencing explanation. Instead, as far as the *Jones* Court was concerned, a sentencer will necessarily consider youth as a mitigating factor so long as the sentencer has discretion to do so. *Jones*, 141 S. Ct. at 1319–20 ("a sentencer cannot avoid considering the defendant's youth if the sentencer has discretion to consider that mitigating factor"). In Ninham's case, the trial judge had discretion to consider Ninham's youth and to impose a lesser sentence. The judge did not "expressly refuse[] as a matter of law" to consider Ninham's youth. *Id.* at 1320 n.7. Thus, the Wisconsin Court of Appeals reasonably applied *Jones* to the facts of Ninham's case when it concluded that "the sentencing court properly considered Ninham's youth and its attendant circumstances." (ECF No. 8-5 at 5.) Because *Jones* itself interprets *Miller* and *Montgomery* and arguably limits those cases

19

or confines them to their holdings, the court of appeals' decision cannot be considered contrary to, or an unreasonable application of, *Miller* or *Montgomery*. *Cf. Walker v. Tegels*, No. 22-cv-311, 2023 WL 2933463, at *3 (W.D. Wis. April 13, 2023) (concluding that *Jones* interpreted *Miller* and *Montgomery* narrowly).

Ninham, however, contends that he can satisfy § 2254(d) for several reasons. First, he contends that the Wisconsin Court of Appeals' decision is contrary to *Miller* because the court concluded that "because [Ninham's] original sentencing was discretionary, it was necessarily constitutional." (Br. in Supp. at 23.) Ninham contends that this conclusion was contrary to "*Miller*'s clear holding that the sentencer 'is require[d] . . . to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" (*Id.* at 23–24 (quoting *Miller*, 567 U.S. at 480)). This argument fails for two reasons. First, to the extent that the court of appeals concluded that discretionary sentencing was all that was constitutionally required, the court would have reasonably applied the existing Supreme Court case law. Although *Miller* contains the language quoted by Ninham, *Jones* determined that this aspect of *Miller* is necessarily satisfied by a discretionary sentencing system in which the sentencer does not expressly refuse as a matter of law to consider the defendant's youth. Again, *Jones* understood *Miller* to hold that a state's "discretionary sentencing system" is "constitutionally sufficient." *Jones*, 141 S. Ct. at 1313.

Second, the Wisconsin Court of Appeals did not rest its decision on the mere fact that the sentencer had discretion to impose a lesser sentence. The court also found that "the sentencing court considered Ninham's youth and its attendant circumstances as mitigating factors when it sentenced him to life without parole." (ECF No. 8-5 at 4.) The

20

court noted that Ninham's attorney argued that Ninham's youth was a mitigating factor and that the trial court "explicitly discussed Ninham's youth in its sentencing remarks." (*Id.*) The court of appeals found that "[u]ltimately, the court gave more weight to other factors, including the 'horrific' nature of the offense and the need to protect the public, than [to] Ninham's age and its attendant circumstances." (*Id.*)

Ninham next argues that because the trial court imposed Ninham's sentence before the Supreme Court decided the cases in which it recognized that children are constitutionally different from adults for purposes of sentencing (*i.e.*, *Roper*, *Graham*, *Miller*, and *Montgomery*), this case is distinguishable from *Jones*. In *Jones*, the defendant was resentenced after *Miller* was decided. *See* 141 S. Ct. at 1312–13. However, nothing in the Court's cases clearly establishes that a sentencer must have been aware of the Supreme Court's specific views on youth as a mitigating factor at the time of sentencing. Indeed, the Ninth Circuit recently denied habeas relief to a petitioner who was sentenced as a juvenile to life without parole under a discretionary sentencing scheme in 1999, before *Roper*, *Graham*, and *Miller* were decided. *Jessup v. Shinn*, 31 F.4th 1262, 1263 (9th Cir. 2022). Notably, the Ninth Circuit found that the petitioner could not satisfy § 2254(d) even after excluding *Jones* from the body of relevant cases. *See id.* at 1266 (reviewing state decision for compliance with *Miller* and *Montgomery* but excluding *Jones* from consideration because it had not been decided at the time of the state-court decision). Thus, in the Ninth Circuit's view, the state court did not render a decision that was contrary to, or an unreasonable application of, *Miller* and *Montgomery* by upholding a discretionary life-without-parole sentence imposed before the Supreme Court found that children were constitutionally different from adults for purposes of sentencing. *See also*

21

*Kelly v. Brown*, 851 F.3d 686, 686–88 (7th Cir.2017) (refusing to grant leave to file successive habeas petition based on *Miller* and *Montgomery* to juvenile offender sentenced to *de facto* life sentence prior to 1999 on ground that original sentencing hearing complied with *Miller*). Once *Jones* is factored into the analysis, it is even harder to say that a state court unreasonably applied clearly established Supreme Court law by failing to vacate a discretionary life-without-parole sentence simply because it was imposed before *Roper*, *Graham*, *Miller*, and *Montgomery* were decided.[3]

In any event, I again point out that the Wisconsin Court of Appeals found that the trial court "considered Ninham's youth and its attendant circumstances as mitigating factors when it sentenced him to life without parole." (ECF No. 8-5 at 4.) In other words, the court found that the trial court properly considered the factors on which the Supreme Court would later rely when it invalidated mandatory life-without-parole sentences for juvenile offenders. Here, Ninham advances a different argument—he contends that the court of appeals unreasonably determined the facts or unreasonably applied *Miller* and *Montgomery* when it concluded that the trial court considered youth in the way that the Supreme Court intended. (Br. in Supp. at 25.) Ninham contends that although the trial court acknowledged his youth and other circumstances, such as his abusive family and

---

[3] Ninham cites a Seventh Circuit case decided in 2016 and a concurring opinion to a Supreme Court grant, vacate, and remand order as support for the proposition that a sentencer should have an opportunity to consider the Supreme Court's statements about children being different before imposing a sentence of life without parole. *See Adams v. Alabama*, 136 S. Ct. 1796, 1800 (2016) (Sotomayor, J., concurring); *McKinley v. Butler*, 809 F.3d 908 (7th Cir. 2016). However, neither of these authorities clearly establishes any law for purposes of § 2254(d). Moreover, both authorities were issued before *Jones* was decided and express views that were arguably rejected in *Jones*, such as that a court must at least implicitly find that the offender is irreparably corrupt. *Adams*, 578 U.S. at 1800–01.

22

his problems with alcohol, the court refused to consider those factors as "mitigating." (*Id.* at 26.)

Ninham's argument turns on an interpretation of the sentencing transcript, but so long as the court of appeals reasonably interpreted that transcript and reasonably applied Supreme Court cases to it, its decision is entitled to deference under § 2254(d). And nothing the trial court said clearly shows that it refused to consider youth and its attendant characteristics as mitigating in the way contemplated by *Miller* and *Montgomery*, at least as those cases were interpreted in *Jones*. The court of appeals could have reasonably understood the sentencing court's comments about youth as indicating that it deemed Ninham's youth "to be outweighed by other factors" or "an insufficient reason to support a lesser sentence under the facts of the case," which are conclusions that remain permissible. *See Jones*, 141 S. Ct. at 1320 n.7. For example, Ninham points to the sentencing court's statement that Ninham was a "frightening young man" and "a child beyond description to this Court" who "knew what he was doing" as evidence that the sentencer did not view youth as a mitigating factor. (Br. in Supp. at 26.) But the court of appeals could have reasonably regarded these statements as meaning that Ninham's crimes (the murder and later threatening a judge and witnesses) were so serious and horrific as to outweigh the mitigating effects of youth. Ninham also points to the sentencing court's statements that it would not allow Ninham's dysfunctional family circumstances, his alcohol abuse, or pressure by his peers to serve as excuses. (*Id.* at 26–28.) But the court of appeals could have reasonably construed these statements as meaning that the court deemed such circumstances "insufficient reason[s] to support a lesser sentence under the facts of the case," *Jones*, 141 S. Ct. at 1320 n.7, rather than as a conclusion

23

that they could not be considered mitigating at all. Thus, the court of appeals did not unreasonably determine the facts or unreasonably apply Supreme Court cases when it concluded that the sentencing court properly considered youth as a mitigating factor.

Finally, Ninham contends that the trial court failed to consider the possibility of rehabilitation as required by *Miller* and *Montgomery*. Ninham notes that the sentencing court did not explicitly acknowledge his lack of prior violence or the rehabilitative effects of the treatment he had received at the group home since the time of the homicide. (Br. in Supp. at 28.) While it is true that the sentencing court said nothing about these facts, it is also true that, after *Jones*, a sentencing court's failure to explicitly discuss the potential for rehabilitation cannot be regarded as a clear violation of Supreme Court law. As noted, *Jones* holds that a sentencer does not need to provide "an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility." 141 S. Ct. at 1321. Further, the trial court indicated that it had considered the defense presentence report that discussed Ninham's treatment at the group home. (Sentencing Tr. at 24–25 (referencing Padway report and stating that the court "read these pre-sentence reports over and over").) The court did not exclude that report from its consideration as a matter of law. Thus, the trial court's failure to explicitly discuss Ninham's potential for rehabilitation before imposing a sentence of life without parole cannot be regarded as a violation of the Eighth Amendment.

Relatedly, Ninham argues that "[t]o the extent that the sentencing court considered [his] potential for rehabilitation at all, it seemed to find that he was capable of rehabilitation." (Br. in Supp. at 28.) Here, Ninham points to the following statement in the

24

sentencing transcript, which the court made after announcing that it was sentencing him to life without parole:

> The interruption that you caused in your own life back on that evening in September is going to force you to change the direction of that life under circumstances over which I had some control, but you have the most control. And if you don't make that adjustment, God help you.

(Sentencing Tr. at 29–30.) Ninham suggests that this statement "appears to indicate" that the court was not convinced that Ninham was "the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible." (Br. in Supp. at 28.) I will assume without deciding that if the trial court explicitly found that Ninham was capable of rehabilitation, then his sentence would violate the Eight Amendment. *See United States v. Grant*, 9 F.4th 186, 197 (3d Cir. 2021) (indicating that a "gratuitous" finding of corrigibility might give rise to an as-applied Eighth Amendment claim). However, as Ninham's own qualifying language (*i.e.*, "seemed to find" and "appears to indicate") shows, the trial court's statement is ambiguous and cannot be regarded as a clear finding that Ninham was capable of rehabilitation. Indeed, given the court's comments about Ninham's character and the need to protect the public from him, it is clear that the court did not think him capable of reform. At the very least, the presence of this statement in the transcript does not render unreasonable the Wisconsin Court of Appeals' conclusion that the sentencing court complied with the requirements of *Miller*, *Montgomery*, and *Jones*.

In short, Ninham is not entitled to relief on his claim that the sentencing court failed to properly consider youth and its attendant characteristics as mitigating factors.

25

## C. As-Applied Disproportionality Claim

In his remaining claim, Ninham argues that his life-without-parole sentence is unconstitutionally disproportionate. He contends that even if the sentencing court considered the proper factors when exercising its discretion to sentence him to life without parole, that sentence violates the Eighth Amendment's substantive limit on such sentences for juveniles because the record shows that he is capable of rehabilitation and that his crime reflected "unfortunate yet transient immaturity." *Montgomery*, 577 U.S. at 208 (quoting *Miller*, 567 U.S. at 479). Here, Ninham seeks not just a new sentencing hearing at which the sentencer may consider whether the sentence of life without parole remains appropriate after *Miller*; he seeks a grant of habeas relief establishing that it would violate the Eighth Amendment for any court to sentence him to life without parole.

Initially, Ninham argues that AEDPA's standard of review does not apply to this claim because the Wisconsin Court of Appeals did not adjudicate its merits. Ninham cites authority stating that "where a state court overlooks a constitutional claim that was fairly presented to it, federal review is *de novo*." *Harris v. Thompson*, 698 F.3d 609, 624 (7th Cir. 2012). He then contends that the court of appeals did not directly address his claim that his sentence was "unconstitutionally disproportionate." (Br. in Supp. at 11.) It is true that the court of appeals did not explicitly discuss the disproportionality claim that Ninham raises in his federal habeas petition. However, that may be because Ninham did not fairly present it to the court of appeals. A review of Ninham's briefs in that court shows that he argued that the sentencing court violated *Miller* and *Montgomery* by failing to properly consider his youth and its attendant circumstances as mitigating factors. (*See* Opening Br. at 20–42, ECF No. 8-2 & Reply Br. at 1–10, ECF No. 8-4.) Ninham did not separately

26

argue that, even if the sentencer properly considered his youth and attendant circumstances, the record independently established that his sentence of life without parole was unconstitutionally disproportionate. Ninham raised that claim for the first time in his petition for review with the Wisconsin Supreme Court. (ECF No. 8-6 at 18–28 of 42.) Thus, it appears that Ninham either failed to exhaust or procedurally defaulted his as-applied disproportionality claim. *See Johnson v. Pollard*, 559 F.3d 746, 751–52 (7th Cir. 2009) (exhaustion requires fair presentment at each level of state's established review process; failure to properly exhaust can result in procedural default). If that is so, then I could not grant relief on the merits of the claim. *Id.*

However, the respondent has not raised lack of exhaustion or procedural default as defenses. In his answer, the respondent "admits that Ninham raised the two *Miller* claims raised in his section 2254 petition through one full round of state court review." (Answer ¶ 9.) The respondent later asserts that "unless specifically admitted elsewhere," Ninham "procedurally defaulted at least some of his federal claims." (*Id.* ¶ 14.) Presumably, because the respondent admits that Ninham exhausted the only two claims raised in his petition, respondent is not asserting that Ninham procedurally defaulted either claim. Instead of arguing that Ninham failed to exhaust or defaulted his disproportionality claim, respondent argues that the Wisconsin Court of Appeals should be presumed to have adjudicated that claim on the merits. (Br. in Opp. at 12–13, ECF No. 14.)

It is true that a federal court must presume that that a federal claim was adjudicated on the merits. However, that presumption applies only to claims that the defendant raised in state court in the first place. *Johnson v. Williams*, 568 U.S. 289, 293 (2013) (explaining

27

that presumption applies to "claims raised by a defendant" in state court). Here, it appears that the reason the Wisconsin Court of Appeals did not discuss Ninham's disproportionality claim is because he did not raise it. Thus, the presumption should not apply. However, in his reply brief in this court, Ninham does not argue that the presumption does not apply or otherwise revisit his claim that the court of appeals did not address his disproportionality claim on the merits. (*See generally* ECF No. 15.)

In light of the above, I have considered asking for supplemental briefing to determine whether I may raise the defenses of lack of exhaustion and/or procedural default *sua sponte* or whether the respondent has waived those defenses. *See Wood v. Milyard*, 566 U.S. 463, 466 (2012) (holding that although court may raise procedural defense *sua sponte*, it may not do so if respondent deliberately waived the defense). However, I have decided not to take this step. A federal court may deny a habeas petition on the merits even if a federal claim is unexhausted or procedurally defaulted. *See* 28 U.S.C. § 2254(b)(2); *Carrion v. Butler*, 835 F.3d 764, 772 & n.26 (7th Cir. 2016). As explained below, whether I review the disproportionality claim under § 2254(d) or de novo, I would reject it on the merits.

First, if § 2254(d) applied, the claim would fail because no Supreme Court case clearly establishes the kind of disproportionality claim that Ninham advances. Ninham's claim is based on the *Jones* Court's statement that it was not considering "any as-applied Eighth Amendment claim of disproportionality regarding Jones's sentence." 141 S. Ct. at 1322. Ninham assumes that the Court was leaving the door open to an as-applied claim based on *Montgomery*'s statement that sentencing a child whose crime reflects transient immaturity to life without parole is disproportionate under the Eighth Amendment. *See*

28

*Montgomery*, 577 U.S. at 211. However, even if that were true, the *Jones* Court did not actually decide or otherwise clearly establish that such a claim exists. Instead, it pointed out that no as-applied claim was raised and that therefore it was not considering such a claim. Moreover, there is good reason to think that the *Jones* Court was not referring to a disproportionality claim based on *Miller* and *Montgomery*. After stating that it was not considering an as-applied disproportionality claim, the Court cited Justice Kennedy's controlling opinion in *Harmelin v. Michigan*, 501 U.S. 957, 996–1009 (1991). This citation implies that any as-applied Eighth Amendment disproportionality claim must proceed under the framework outlined in *Harmelin*. Under *Harmelin*, such a claim requires "a threshold comparison of the crime committed and the sentence imposed" that "leads to an inference of gross disproportionality." 501 U.S. at 1005 (Kennedy, J., concurring). Ninham does not attempt to establish an inference of "gross disproportionality" in his habeas briefs.[4]

Looking beyond *Jones*, no other Supreme Court case clearly recognizes an as-applied disproportionality claim based on *Miller* or *Montgomery*. It is not even clear how a court would adjudicate such a claim. Ninham seems to assume that a court considering the claim may assess the same record presented to the sentencing court—plus evidence that the offender has procured since the time of sentencing[5]—and make an independent

---

[4] Ninham raised a disproportionality claim based on cases similar to *Harmelin* in his prior state postconviction motion, which the Wisconsin Supreme Court rejected on the merits. *See Ninham*, 333 Wis. 2d at 381–82.

[5] In addition to the sentencing record, Ninham relies on affidavits he procured in 2007, including one from a neuropsychologist who examined him when he was 23. (ECF No. 11-1.)

determination that the crime reflected transient immaturity. (Br. in Supp. at 12–21.) But this approach conflicts with the *Jones* Court's determination that permanent incorrigibility is not an "eligibility criterion" for the sentence of life without parole and that youth is instead "a sentencing factor akin to a mitigating circumstance." 141 S. Ct. at 1315. The Supreme Court's cases "afford sentencers wide discretion in determining 'the weight to be given relevant mitigating evidence.'" *Id.* at 1316 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114–15 (1982)). Given that the Court's cases afford sentencers such wide discretion, those cases could not also be interpreted as requiring a reviewing court to make an independent determination on the question of transient immaturity that affords no deference to the sentencer's initial weighing of youth as a mitigating factor.

Accordingly, the Wisconsin Court of Appeals' implied rejection of the kind of as-applied disproportionality claim Ninham now advances was not contrary to, and did not involve an unreasonable application of, clearly established federal as determined by the Supreme Court of the United States. For similar reasons, I would reject the claim even if I could review it de novo. Again, the Eighth Amendment affords sentencing courts wide discretion in determining the weight to assign mitigating evidence, and therefore I may not reweigh the evidence, consider Ninham's new evidence, and make an independent determination that Ninham's crime reflected transient immaturity.

Perhaps Ninham means to argue that, even though the sentencing court had discretion to weigh the mitigating evidence, the record permitted only one reasonable conclusion—that Ninham's crime reflected transient immaturity rather than permanent incorrigibility. However, Ninham does not cite, and I have not found, a case in which a reviewing court found that mitigating evidence was so strong that the Eighth Amendment

30

*compelled* the sentencer to give it dispositive weight. Further, such an approach would conflict with the Supreme Court's determination that "[t]he sentencer [and the reviewing court on direct appeal] may determine the weight to be given relevant mitigating evidence." *Eddings v. Oklahoma*, 455 U.S. 104, 114–15 (1982); *see also United States v. Hall*, 152 F.3d 381, 409 (5th Cir. 1998) ("The Constitution does not require that a juror be willing to give a mitigating factor any particular amount of weight; it only requires that the juror manifest an ability to consider such factors in determining whether death is an appropriate punishment"); *Magwood v. Smith*, 791 F.2d 1438, 1449 (11th Cir. 1986) (in a capital case, "a federal habeas corpus court will not re-evaluate the *weight* accorded to particular aggravating and mitigating factors"). Thus, I do not believe that the Eighth Amendment empowers me to declare Ninham ineligible for the sentence of life without parole based on the strength of his mitigating evidence.

But even if I had the power to find that Ninham was ineligible for a sentence of life without parole because the mitigating evidence was conclusive, I would not deem the mitigating evidence conclusive here. A sentencer could have reasonably concluded that the nature of Ninham's crime outweighed the mitigating evidence consisting of his age, substance abuse, family circumstances, and the unplanned and peer-driven nature of the offense. Ninham committed an extremely heinous murder. He randomly targeted an innocent child, beat him, tortured him by swinging him out over a 5-story drop, and then intentionally killed him by letting him go as he was pleading for his life. It is telling that, in his brief, Ninham must resort to serial killer Jeffrey Dahmer to find an example of a murderer in the State of Wisconsin who could be considered to have committed crimes more heinous than his. (Reply Br. at 7–8.) Further, while Ninham points to his conduct at

31

a group home between the time of the murder and the time of his arrest as evidence of his capacity for rehabilitation, I do not find this evidence particularly compelling. During this period of supposed rehabilitation, Ninham was being interviewed by police investigating Vang's death and either lied about his involvement or refused to admit responsibility. (Sentencing Tr. at 12–13.[6])  Once he was arrested, Ninham returned to violent ways by making threats against the judge and the witnesses to the murder. While Ninham now contends that those threats were themselves merely a product of his youth, the sentencing court was not required to agree. The sentencing court could have reasonably found that Ninham's pattern of criminal activity reflected irreparable corruption.[7]

Accordingly, I conclude that Ninham is not entitled to relief on his as-applied disproportionality claim.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED**. The Clerk of Court shall enter final judgment. Pursuant to Rule 11 of the Rules Governing § 2254 Cases, I find that the petitioner has not made the showing required by 28 U.S.C. § 2253(c)(2), and therefore I will not issue a certificate of appealability.

---

[6] The defense presentence report states that Ninham began residing at the group home in December 1998. (ECF No. 9-1 at 17 of 21.) The police interviewed Ninham before he entered the home, but also in the following spring. (Sentencing Tr. at 12.)

[7] Given the heinousness of the murder, even if Ninham had raised a claim of gross disproportionality under cases such as *Harmelin*, 501 U.S. at 996–1009, and even if I could review that claim de novo, I would reject it on the merits.

Dated at Milwaukee, Wisconsin, this 22nd day of May, 2023.

/s/Lynn Adelman
LYNN ADELMAN
United States District Judge